UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

D-1 RAMIAH JEFFERSON,
D-3 EVAN JOHNSON,
D-4 MARIO GARNES,

        Defendants.

_____/

Case No. 14-20119

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING DEFENDANTS' RULE 29 MOTIONS FOR ACQUITTAL AND RULE 33 MOTIONS FOR A NEW TRIAL [380, 382, 383] AND JOINDER [393]

After nearly a month long trial, Defendants Ramiah Jefferson, Evan Johnson, and Mario Garnes ("Defendants") were found guilty of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) for their participation in an enterprise known as the "Bounty Hunter Bloods". The jury further found that Jefferson and Johnson intended at least one other RICO conspirator to commit the racketeering act of robbery, thus increasing their maximum potential sentence from 20 years to life in prison. 18. U.S.C. § 1963(a). Finally, Jefferson and Johnson were also convicted of possessing a firearm in furtherance of a crime of violence under 18 U.S.C. § 924(c).

Currently before the Court are various post-trial motions filed by Defendants seeking either acquittal or a new trial under Federal Rules of Criminal Procedure 29 and 33. More specifically, Jefferson argues that (1) the RICO statute is unconstitutional as applied to him because the Government failed to establish a pattern of racketeering activity, (2) "there was

no testimony from any witness . . . that [he] was involved in or conspired to commit any robberies . . . . " (Jefferson Br. 20), and (3) the jury instructions improperly defined the robbery enhancement under 18 U.S.C. § 1963(a). (Dkt. 380). Johnson, for his part, while joining in Jefferson's motion (Dkt. 393), takes a slightly different approach to challenging the sufficiency of the evidence, maintaining that the Government failed to specifically tie the racketeering acts to the Bounty Hunter enterprise. (Dkt. 383). Finally, Garnes likewise asserts that the evidence presented at trial was insufficient to sustain his conviction of RICO conspiracy. (Dkt. 382).

The Court held a hearing on this motion on January 20, 2016. For the reasons stated below, Defendants' motions are DENIED.

## I.   BACKGROUND

The Bounty Hunter Bloods–also known as the Bounty Hunter Gang, BHB, and the Hunnas–were a neighborhood street gang operating primarily on the northwest side of Detroit, Michigan.[1] Bounty Hunter Members identified themselves through the use of hand gestures, tattoos, graffiti, and wearing the colors red, green, and tan.[2] The gang was formally organized through a set of written by-laws which all members were expected to learn and follow. Entrance to the Bounty Hunters was gained through one of three initiation processes: a new member could be "blessed-in", "blood-in", or "sexed-in." With respect to the "blood-in" process–seemingly the most common way to be initiated–the recruit was

---

[1] According to the Government's confidential informant, the Bounty Hunters' territory stretched from Eight Mile Road to Schoolcraft north to south, and Telgraph Road to Livernois east to west. (Trial Tr. Vol. 4 at 113).

[2] In 2010, the Bounty Hunters are alleged to have abandoned this color scheme in favor of black and red.

2

required to fight several members of the gang with one arm secured by a bandana to his or her pants. If the recruit withstood the beating without losing the bandana, they were admitted to the membership ranks.

The by-laws also established a hierarchy of command for the gang. Generally speaking, the power structure–top to bottom–was defined as follows: Young Original General, Young General, Capo (designated first, second, or third), Lieutenant, and Solider. One's rank in the Bounty Hunters necessarily informed their role within the organization. Young Generals, for example, directed the gang's criminal endeavors, allocated "pot money",[3] distributed weapons, and provided the "green light" to members performing acts of violence. Lieutenants and Soldiers, on the other hand, were the boots on the ground responsible for recruiting new members, generating pot money, "tagging" graffiti in the gang's operating area, and "putting in work." Bounty Hunter members who contributed money to the organization and carried out the criminal directives of their superiors were eligible for a promotion in rank. Those who failed to live up to the expectations of leadership were subject to discipline in the form of beatings by other members.

On a micro level, the Bounty Hunters were further divided into smaller subsets or "lines" to consolidate the gang's power within certain neighborhoods. The "Seven Mile Line", for example, was made up of around 15 Bounty Hunter members who identified–for one reason or another–with that area of the gang's turf. These lines would hold their own

---

[3] "Pot money" refers to funds generated by Bounty Hunter members from criminal activity. *See* (Trial Tr. Vol. 10 at 42) (**Q.** "With respect to the collection of pot money, was it common knowledge within the Bounty Hunters that pot money came from criminal activity? **A.** Yes.")

meetings, collect pot money, retaliate against rival factions operating within their territory, and communicate with the gang's top leadership on a regular basis.

On March 5, 2014, a grand jury indicted nine individuals in connection with their participation in the Bounty Hunter enterprise. With the exception of Jefferson, Johnson, and Garnes, all Defendants reached a plea agreement with the Government. At trial, the evidence established that Jefferson and Johnson served as the Bounty Hunters' chief executives, while Garnes managed the gang's drug trafficking activities. While the specific role of each Defendant is explored more fully below, the Government presented a plethora of evidence linking the Bounty Hunters to a vast and violent array of criminal conduct including murder, robbery, drug distribution, and weapons possession. As a number of witnesses testified, much of this violence was directed towards innocent members of the community having no affiliation with the gang or its rivals. Ultimately, the jury found all three Defendants guilty of RICO conspiracy, and further concluded that Jefferson and Johnson possessed a firearm in furtherance of a crime of violence. Against this backdrop, the Court endeavors to address Defendants' legal and evidentiary challenges to the jury's verdict.

## II.  Rule 29 Motions for Acquittal

At the close of the Government's case, Defendants jointly moved for a judgment of acquittal. (Dkt. 358). The Court denied Defendants' motion, finding sufficient evidence in the record to submit the charges in the challenged counts to the jury. (Mot. J. Acquittal Hr'g Tr. Vol. 17 at 19-23). The trial continued to a jury verdict of guilt as to each Defendant on the charges described above. Defendants' renewed Rule 29 motions are, to some extent, a refined version of their previous arguments. The Court incorporates by reference its prior

4

findings and conclusions set forth on the record, and rejects any challenges not specifically raised–and developed–in Defendants' post-trial motions for the reasons previously stated.

### A. Standard of Review

"Evidence is sufficient to sustain a conviction if after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Driver*, 535 F.3d 424, 428–29 (6th Cir. 2008) (internal quotation marks and citations omitted). "In examining claims of insufficient evidence, this court does not weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted). As the Sixth Circuit recently observed, "defendants bear a heavy burden when asserting insufficiency of the evidence arguments." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010). That is because "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt," and "the uncorroborated testimony of an accomplice alone may support a conviction." *Id.* (internal quotation marks and citations omitted).

### B. Analysis

#### 1. Individual Sufficiency of the Evidence Arguments

The jury found Jefferson, Johnson, and Garnes guilty as charged in Count One of the Third Superseding Indictment (the "Indictment") of racketeering conspiracy in violation of 18 U.S.C § 1962(d). Defendants have each lodged specific challenges to the

5

sufficiency of the evidence supporting their convictions under Count One, which the Court addresses here.

As the Court instructed the jury, in order to convict the Defendants of racketeering conspiracy beyond a reasonable doubt, the Government was required to prove that: (1) the Bounty Hunters existed as an enterprise as described in the Indictment; (2) each Defendant was associated with the enterprise; (3) each Defendant knowingly agreed to participate in the conduct of the enterprise; (4) each Defendant and at least one other conspirator agreed that the Defendant or a conspirator would commit at least two acts of racketeering in furtherance of the enterprise; and (5) the activities of the enterprise affected interstate commerce. (Trial Tr. Vol. 18 at 16-19); *see United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008). With respect to the fourth prong, a RICO conspiracy charge does not require proof that the defendant "agreed to commit two predicate acts himself, or even that any overt acts have been committed. To the contrary, it merely requires proof that the defendant 'intended to further 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.' " *Id.* at 421 (quoting *Salinas v. United States*, 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

### a.   Defendant Ramiah Jefferson

Ramiah Jefferson, also known as "Rio" or "Nightmare" to his Bounty Hunter associates, argues that he is entitled to a judgment of acquittal on Count One for two reasons: First, he maintains that, "[a]t trial, the prosecution relied on an overly expansive theory of the 'pattern of racketeering' element of RICO, an element that is inherently vague." (Jefferson Br. 14). In this way, Jefferson contends that, because the Government

6

failed to produce sufficient evidence that he engaged in a "pattern of racketeering" consistent with his understanding of that concept, the RICO statute is unconstitutional as applied.  Next, Jefferson asserts that he must likewise be acquitted of the enhancement allegation related to Count One because there was insufficient evidence to establish that he "knowingly and intentionally conspired to commit any specific robbery or that he specifically intended to help such a crime."  (Jefferson Br. 3).

A "pattern of racketeering activity" requires a minimum of two predicate acts.  *See* 18 U.S.C. § 1961(5).  "In order to establish that any two predicate acts constitute a pattern of racketeering activity, the Government must satisfy the 'continuity plus relationship' test, which requires proof of (1) a relationship between the predicate acts and (2) the threat of continued activity.' " *United States v. Fowler*, 535 F.3d 408, 419 (6th Cir. 2008) (quotations omitted).  In considering the "continuity plus relationship" test, the Supreme Court has explained the government's burden this way:

> [T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond, those traditionally grouped under the phrase 'organized crime.'

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 242-43, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).  As to relationship or relatedness, "[t]he business of a criminal enterprise is crime [and its] crimes form a pattern defined by the purposes of the enterprise." *United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (quotations omitted).  Furthermore, the "predicate acts do not necessarily need to be directly interrelated; they must, however, be connected to the affairs and operations of the criminal enterprise." *Id.*

7

There is no question that Jefferson's participation in the Bounty Hunter enterprise supported the jury's finding that he engaged in a pattern of racketeering activity. From an organizational perspective, Jefferson occupied the role of "Original General"; the most powerful position in the Detroit Bounty Hunters. (Gov't Ex. 43J). In fact, according to evidence seized from his Facebook account, Jefferson claimed to be the "commander in chief", running "9 lines in 7 states." (Gov't Ex. RJ_FB_14). As several witnesses testified, Jefferson leveraged his power in support of the gang's criminal objectives in a number of ways. By requiring the payment of "pot money" at Bounty Hunter meetings, for example, Jefferson implicitly agreed to other members' drug-dealing and acts of violence. Indeed, as one former high-ranking member testified:

> **Q.** Now, as a young general did you understand that members were making their pot money using money they made from selling drugs?
>
> **A.** Yes.
>
> **Q.** Did you understand that other Bounty Hunter members paid their pot money using money that they made committing robberies
>
> **A.** Yes.
>
> **Q.** As a young general, did you understand that other Bounty Hunter members paid their pot money from the money they made committing home invasions?
>
> **A.** Yes.

(Trial Tr. Vol. 10 at 26). As someone who personally collected–and spent–pot money and awarded "rank" to members who "put in work",[4] (Trial Tr. Vol. 10 at 17, 28), it was reasonable for the jury to infer that Jefferson, as the leader of the Bounty Hunters, "was

---

[4] Putting in work included, among other things, narcotics distribution, home invasions, robberies, and shootings. (Trial Tr. Vol. 10 at 14, 18-19).

8

aware of and directing [] members' activities such that he was guilty of conspiring to violate RICO." *United States v. Nagi*, 541 F. App'x 556, 574 (6th Cir. 2013), *vacated on other grounds*, 134 S.Ct. 2288 (2015); *see also United States v. Tocco*, 200 F.3d 401, 426 (6th Cir. 2000) (rejecting the defendant's argument that "he had no knowledge of many of the acts committed by the others in the purported conspiracy" because "[t]he testimony confirmed the general nature of the enterprise, and that [he] knew that the enterprise extended beyond his [leadership] role therein.").

While there is little doubt that Jefferson's leadership role was sufficient, on its own, to establish a "pattern of racketeering activity", there is, nonetheless, a plethora of evidence that he was directly involved in the gang's drug distribution efforts.  Indeed, the ATF seized multiple marijuana plants and a digital scale from various places where he  was known to reside.  (Gov't Exs. 70F-I, 73 (physical exhibit)). Furthermore, text messages established that Jefferson engaged in drug transactions with Bounty Hunters Evan Johnson and Mario Garnes. *See* (Gov't Ex. EJ_Cell_23) ("[Jefferson]: Wattz up Bhro? [Johnson]: got tree? [Jefferson]: Lol I'm about to grab some bro. [Johnson]: I was tryna swoop somethin bfore I shot to the suburbs. [Jefferson]: Ok let me Kall my pops."); (Gov't Ex. MG_FB_18) ("I grabbed tha two bags tho and was gone bring u back ten.").  And Jefferson's cell phone was chock full of images depicting marijuana being weighed on a digital scale and individually bagged for sale.  (Gov't Exs. RJ_Cell_30-37).  "In light of this evidence, and the additional evidence that [Jefferson] had engaged in [marijuana] transactions with at least one other [Bounty Hunter] member, it would be difficult to conclude that [Jefferson's] drug dealing was merely coincidental to his membership in the" gang. *United States v. Fowler*, 535 F.3d 408, 420 (6th Cir. 2008) (concluding that "a rational jury could conclude beyond

a reasonable doubt that Fowler's drug dealing was related to the OMC criminal enterprise."). In sum, the "continuity plus relationship" test was easily satisfied here because the Government introduced sufficient evidence to convince a rational jury beyond a reasonable doubt that Jefferson's predicate acts were related to the activities of the enterprise.

Jefferson's next argument, that there was insufficient evidence to support the enhancement allegation that he conspired to commit a robbery, fails for similar reasons. While it's true that there was "no testimony from any witness that establishes that Jefferson was [directly] involved in . . . any robberies . . . .", (Jefferson Br. 20), that is plainly not what the law requires. "To the contrary, [RICO conspiracy] merely requires proof that the defendant 'intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO criminal offense' and it suffices that he adopt the goal of *furthering or facilitating the criminal endeavor*." *Fowler*, 535 F.3d at 421 (emphasis added). As a high-ranking leader in the Bounty Hunters, Jefferson was responsible for awarding rank to members who "put in work." Several witnesses testified that "putting in work" included committing robberies to generate "pot money" for the enterprise. (Trial Tr. Vol. 10 at 14). And, according to Drakkar Cunningham, the gang's leadership understood that members were committing those robberies to "increase their status in the gang." (Trial Tr. Vol. 10 at 18).

Moreover, as the Government points out, Jefferson "frequently supplied guns to Jamare Rucker–a Bounty Hunter who regularly committed robberies, robbed a woman at gunpoint, and then murdered a security guard during a carjacking." (Gov. Resp. 7); (Trial Tr. Vol. 13 at 48-60) ("**Q.** And if you know, were the firearms given by Mr. Jefferson to Mr.

10

Rucker, were they loaded or unloaded . . . . **A.** Loaded. **Q.** Did you have an occasion where Mr. Rucker would return the firearm? **A.** Yes. **Q.** Did he return them loaded or unloaded? **A.** Unloaded."). Jefferson also agreed to put money in Shon Hargrove's prison account– a fellow Bounty Hunter who was incarcerated in connection with a robbery he committed in Oak Park, Michigan. (Gov't Ex. 151). Taken together, this evidence–considered in conjunction with Jefferson's leadership role–permitted the jury to infer that he adopted the goal of "furthering or facilitating" a robbery. *See United States v. Thomas*, 490 F. App'x 514, *3, 5 (4th Cir. 2012) ("[o]ur review of the record reveals substantial evidence that the RICO [c]onspiracy included conspiracy to commit murder as an enterprise objective" where defendants were gang leaders with power to determine "when somebody need[ed] to die.").

Finally, Jefferson lodges two general legal challenges to Count One, both of which can be summarily disposed of. First, he argues that the "combination of the inherent breadth of the RICO statute and vagueness of its elements, . . . has resulted in an application of the statute here which is unconstitutional." (Jefferson Br. 19). But "[e]very circuit which has addressed the void-for-vagueness issue following the Supreme Court's decision in *H.J. Inc . . .* has held that the RICO statute is not unconstitutionally vague." *United States v. Keltner*, 147 F.3d 662, 667 (8th Cir. 1998) (citing cases). And, for the reasons discussed, the Court is far from convinced that the RICO statute is vague as applied. By Jefferson's own admission, he was the leader of a national gang with tentacles in at least seven states. In this capacity, he helped to expand the Bounty Hunters reach to new territory, provided firearms for members to conduct official business, and awarded rank to individuals who actively pursued the gang's criminal objectives. In this way, Jefferson's conduct falls

11

squarely within RICO's principal aim– the eradication of organized crime.  *See United States v. Chance*, 306 F.3d 356, 395 (6th Cir. 2002) ("After all, Congress' purpose in enacting the RICO statutes was to eradicate organized crime.").

As a last ditch appeal, Jefferson argues that the jury instructions failed to properly define the robbery enhancement because they did not require the "commission of a specified act involving robbery . . . ." (Jefferson Br. 9).  In other words, Jefferson maintains that the jury should have been required to identify a specific robbery in support of the statutory enhancement.  But that logic simply not does not comport with the plain language of RICO.   Under 18 U.S.C. § 1963(a), the statutory maximum for a RICO conspiracy conviction increases from 20 years to life if the conspiracy "is based on a *racketeering activity* for which the maximum penalty includes life imprisonment." (emphasis added).  Armed robbery is a "racketeering activity", 18 U.S.C. § 1961(1), which carries a maximum penalty of life imprisonment under Michigan law.  Mich. Comp. Laws. § 750.529; *see Allen v. United States*, 45 F. App'x 402, 405 (6th Cir. 2002) ("18 U.S.C. § 1963(a) appears on its face to incorporate the state sentencing maximums for the "racketeering activities" to the extent that they carry a maximum punishment of life imprisonment.' ").  Thus, in order to find Jefferson guilty of the statutory enhancement, the jury was required to find that his "racketeering activity" was "based on" robbery.  And, as the Sixth Circuit has made clear, "the jury need not be unanimous as to the specific predicate acts that the defendant agreed someone would commit. [It] need only be unanimous as to the *types* of predicate acts that someone would commit."  *United States v. Wilson*, 579 F. App'x 338, 347 (6th Cir. 2014).

The jury instructions and verdict form satisfied RICO's substantive demands.  With respect to the enhancement instructions, the Court stated, "if you find defendant Ramiah

Jefferson . . . guilty of the RICO conspiracy charge, you must specify whether he agreed and intended that at least one other conspirator would commit a racketeering act of robbery." (Trial Tr. Vol. 18 at 38). Likewise, the verdict form required the jury to find that Jefferson agreed and intended "that at least one other conspirator would commit a racketeering act of robbery[.]" (Verdict Form, Dkt. No. 367). Accordingly, there is no doubt that the jury concluded that Jefferson's "racketeering activity" was "based on" robbery. Jefferson fails to offer any authority in support of the proposition that the statutory enhancement requires anything more.[5]

Accordingly, the Court must, and does DENY Jefferson's Rule 29 motion for acquittal.

### b.    Defendant Evan Johnson

Evan Johnson, also known as "Big Ev" or "Unkle Murda", was second in command under Jefferson. (Gov't Ex. 43J); (Gov't Ex. EJ_FB_6) ("My name Big Ev cka Unkle Murda. I'm OYG"). As a top-ranking leader, Johnson contributed to the success of the Bounty Hunter enterprise by overseeing the gang's rank and file. In this way, his "pattern of racketeering activity" very closely mirrored Jefferson's. Indeed, in addition to supporting the criminal objectives of his subordinates, Johnson was likewise actively involved in the gang's drug distribution efforts. In one Facebook exchange, Johnson offered to help someone obtain a "jar" of pills after that individual's "connect [] got locked up." (Gov't Ex. EJ_FB_30). Other messages showed him helping a fellow Bounty Hunter locate "dem trees" and "some gans". (Gov't Ex. EJ_FB_29). And, as previously discussed, on at least

---

[5] The Court addresses Jefferson's *Apprendi* challenge to the statutory enhancement instruction under Rule 33.

13

one occasion Johnson arranged to obtain "tree" from Jefferson before heading out to the suburbs. (Gov't Ex. EJ_CELL_23).

The evidence seized from Johnson's Facebook account demonstrates how closely his life was intertwined with the Bounty Hunter enterprise.  In one  message to Jefferson, he indicated that they "wuz 15 gkoin to war. Not fightin. Real gunplay. You gkotta earn dat y.g. Unk Muder said dat." (Gov't Ex. RJ_FB_13).  In yet another message, Johnson warned a fellow member to "[t]ake all da BHB shit off ya pagke. we hot rite now. Da BHomies Killa J and Glock gkot locked up yestaday for a murda at the hunna house over there on sunderland." (Gov't Ex. EJ_FB_18).  And these are hardly the only examples of Johnson's attempt to manage the gang's daily affairs. *See* (Gov't Ex. EJ_FB_6, 18, 19, 23, 27, 28). Johnson's leadership role significantly undermines his argument that "[t]here was insufficient proof that the specific crimes . . . [were] any more than random acts of violence committed by individuals who also happened to be involved with . . . . " the Bounty Hunters. (Johnson Br. 9-10).

In fact, the evidence supporting Johnson's guilt on the robbery enhancement makes it clear that his racketeering activity was inseparable from the criminal enterprise.  On October 9, 2009, Johnson informed another Bounty Hunter that he located "a handheld [gun] for dat lick [robbery]." (Gov't Ex. EJ_FB_23); (Trial Tr. Vol. 10 at 19-20) ("**Q.** Have you heard the terms "lick" or "hit a lick"? **A.** Yes. **Q.** What do those terms mean to you? **A.** Take something that's not yours, whether you rob somebody or break in."). The individual's response was clear– "nuff said[,] bring it to me big bro an i got anotha one to." (*Id.*).  This evidence, in combination with Johnson's drug dealing, is stronger than other cases where the Sixth Circuit has found an association between the racketeering activity and the criminal

14

enterprise.  As the court explained in *United States v. Lawson*, 535 F.3d 434, 445 (6th Cir.

2008):

> Lawson contends that his drug dealing was not connected to the OMC and
> therefore is not evidence of an agreement to be part of the OMC
> drug-distribution ring. This argument is contradicted by evidence showing that
> he supplied drugs to fellow OMC members, and by the evidence that he did
> so with the knowledge that the drugs would be resold to the general public.
> Thus, one can infer that he had entered into an agreement with other OMC
> members to violate RICO by operating a drug ring.

As such, the Court is persuaded that a reasonable jury could infer from the evidence–as

well as Johnson's leadership position–that his pattern of racketeering activity was carried

out in furtherance of the Bounty Hunter enterprise.[6]  The Court thus DENIES Johnson's

request for an acquittal on Count One and the related robbery enhancement.

Finally, Johnson also contends–albeit in summary fashion–that there was insufficient

evidence to convict him of aiding and abetting under 18 U.S.C. § 924(c) for the use of a

firearm during and in relation to a crime of violence.  To sustain a conviction under section

924(c), the government must prove "that the defendant, as the accomplice, associated and

participated in the use of the firearm in connection with the underlying . . . crime." *United

States v. Franklin*, 415 F.3d 537, 554–55 (6th Cir. 2005) (quotations omitted). "The

government can meet that burden by showing that the defendant both knew that the

principal was armed and acted with the intent to assist or influence the commission of the

underlying predicate act." *United States v. Gardner*, 488 F.3d 700, 712 (6th Cir. 2007).

Here, it was reasonable for the jury to conclude that by supplying a fellow Bounty Hunter

with a gun for the explicit purpose of committing a "lick", Johnson intended to assist or

_____

[6] Johnson also kept close tabs on Jamare Rucker while Rucker was on the run following
a driveway robbery and carjacking at CVS. (Gov't Exs. EJ_CELL_14-19, 28-31).

15

influence the commission of a robbery. (Gov't Ex. EJ_FB_23). Accordingly, the Court likewise DENIES Johnson's motion for acquittal with respect to Count Six.

### c.   Defendant Mario Garnes

Defendant Mario Garnes was convicted of RICO conspiracy under Count One and acquitted of the robbery enhancement.  The crux of his Rule 29 argument is that "the evidence presented at trial failed to show [him] receiving any type of benefit from his alleged participation with the Bounty Hunters." (Garnes Br. 6).  Whether Garnes benefitted from his association with the Bounty Hunter enterprise is of no consequence; the evidence established beyond a reasonable a doubt that he engaged in a pattern of racketeering activity during his time in the gang.

As Garnes' Facebook account made clear, he was "[h]unter all day"- and, more specifically, "one of two aktive Yg's [i]n Detroit under Iah [Rio] and Big Ev . . . . " (Gov't Ex. MG_FB_9).  According to a depth chart recovered from Garnes' basement, he ranked just below Jefferson and Johnson in terms of gang seniority (Gov't Ex. 43F, 43J), and he frequently challenged individuals who claimed "hunna status" on the internet without providing proper credentials.  (Gov't Ex. MG_FB_10-11).  In fact, after engaging in a lengthy dialogue with someone he initially accused of "lookin lyke a false flagga" on Facebook, he proceeded to school them on the importance of Bounty Hunter nomenclature, noting that "[i]t's tha only thing that separates US from tha wanabes []." (Gov't Ex. MG_FB_8-9).  Much like Johnson and Jefferson, Garnes' daily life was consumed by the affairs of the enterprise.

In the same way, Garnes' pattern of racketeering activity–based on the distribution of controlled substances–was merely an extension of his role in the Bounty Hunters. Indeed,

16

his Facebook account was riddled with examples of drug-dealing as early as 2010–expressing interest in being a "middle man" for a Bounty Hunter member who had "bows of the kush on deck" (Gov't Ex. MG_FB_16) and informing Jefferson that he "grabbed tha two bags" and "was gone bring you back ten." (Gov't Ex. MG_FB_18). In addition to the evidence tied directly to other Bounty Hunter members, the Government produced a number of text messages establishing that Garnes was frequently distributing drugs to "Ko-Worker Jamez and "Kortez".  (Gov't Exs. MG_Cell_3-8).  Finally, in  October 2013, during the execution of a search warrant at Garnes' residence, the ATF uncovered a cache of evidence corroborating his role in the gang's drug distribution efforts, including: 19 marijuana plants, 145 grams of salable marijuana, two digital scales, a list of marijuana prices, packaging material, and several articles of clothing, a bandana, and a necklace bearing the flagship colors of the Bounty Hunter enterprise. (Gov't Exs. 44J, 38G, 38K, 38O, 38KK, 38MM, 38OO, 38QQ). Considered together, it was reasonable for the jury to infer that Garnes  was a principal player in a drug distribution scheme linked to the Bounty Hunters. *See Lawson*, 535 F.3d at 445

Accordingly, the Court DENIES Garnes' Rule 29 motion for acquittal under Count One of the Indictment.

### C.  Conclusion

For the above-stated reasons, Defendants have failed to satisfy their Rule 29 burden in support of acquittal.  The Court now turns to Defendants' Rule 33 motions for a new trial.

### III.   Rule 33 Motions for a New Trial

Defendants next argue–in the alternative–that they are entitled to a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The crux of Defendants' legal challenges in this context fall into two categories. First, Johnson argues that the Court erred by admitting certain co-conspirator statements and physical evidence at trial.  Second, Jefferson contends that the Court "erroneously instructed the jury regarding the findings it was required to make to find him guilty" of the robbery enhancement.  (Jefferson Br. 22). In addition to these specific challenges, Garnes renews the same argument the Court previously addressed under the Rule 29 framework; namely, that the evidence was insufficient to establish the essential elements of RICO conspiracy. As noted below, the Court disposes of this argument in summary fashion.

### A.  Standard of Review

A motion for a new trial is governed by Rule 33 of the Federal Rules of Criminal Procedure. That Rule provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule does not define interest of justice and the courts have had little success in trying to generalize its meaning." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (internal quotation marks and citation omitted). It is, however, "widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *Id.*  This would include "reversible error or violation of the defendant's substantial rights." *Id.* at 374.

Garnes also seeks a new trial on the basis that the jury's verdict is against the weight of the evidence. As the Sixth Circuit recently observed, "[i]n deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district judge may sit as a thirteenth

18

juror and consider the evidence to ensure that there is no miscarriage of justice." *Id.* at 373 n. 9. "Generally, such motions are granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Montgomery*, 358 F. App'x 622, 628 (6th Cir. 2009) (internal quotation marks and citations omitted).

## B. Analysis

### 1. Garnes' Argument Challenging the Sufficiency of the Evidence Fares No Better Under Rule 33

As mentioned, Garnes attempts to reassert his sufficiency argument in the context of a Rule 33 challenge. This is unavailing for a number of reasons. First, the Court rejects the notion that his conviction represents one of those extraordinary circumstances where the evidence preponderates heavily against the verdict. To the contrary, the Court has already addressed and rejected Garnes' argument that the evidence at trial was not only sufficient to sustain his convictions, it weighed heavily in support of the verdict of guilt under Count One. Moreover, Garnes fails to identify any specific reason why, when viewed under the framework set forth in Rule 33, the evidence should be viewed any differently.

Accordingly, the Court rejects this challenge for the same reasons previously articulated. The Court now considers Defendants' arguments that substantial legal or reversible errors warrant a new trial.

### 2. Defendants Are Not Entitled to a New Trial Based on Claims of Legal or Reversible Error

#### a. The Co-conspirator Statements Identified by Johnson were Properly Admitted into Evidence

Johnson maintains that he is entitled to a new trial on the basis that the Court erred by allowing certain co-conspirator statements into evidence under Federal Rule of Evidence 801(d)(2)(E).  This argument fails for the same reason it did at trial, namely; to the extent that any of the identified statements were offered for the truth of the matter asserted, the Government clearly satisfied its burden under Rule 801.

Under Rule 801(d)(2)(E), a co-conspirator's statement made "during and in furtherance of the conspiracy" is "not hearsay."  The Government may therefore use it at trial against any of the co-conspirators to prove the truth of the matter asserted.  *Id.*  The Sixth Circuit has explained that "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the . . . statement was made, and that the statement was in furtherance of the conspiracy, the [statement] is admissible." *United States v. Enright*, 579 F.2d 980, 986 (6th Cir. 1978) (citation omitted). To admit the statements under Rule 801, the Government must prove by a preponderance of the evidence that "(1) a conspiracy existed, (2) that the defendant against whom the [statement] is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979).

Even assuming, *arugendo*, that the statements identified by Johnson were introduced for  the truth of the matter asserted–which is far from clear–they easily pass muster under Rule 801(d)(2)(E).  Indeed, there is no question that the Government has proven beyond a reasonable doubt that each Defendant was a leader in a racketeering conspiracy known as the Bounty Hunter Bloods.  With respect to the third *Vinson* factor, Johnson makes no attempt to substantiate how the statements he has identified–pertaining to the CVS murder,

Oak Park robbery, and various other crimes specifically related to the Bounty Hunter enterprise–were not "intended to promote conspiratorial objectives." *United States v. Zertuche*, 565 F. App'x 377, 384 (6th Cir. 2014). And for good reason; the "in furtherance" element captures a broad array of communication, including "statements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances." *Id.* at 385. The statements identified by Johnson so clearly fit this description that the Court finds no utility in revisiting its decision on this score. *See* (Mot. J. Acquittal Hr'g Trial Tr. Vol. 17 at 16-23).

### b. The Live Rounds and Shell Casings from Johnson's Apartment were Relevant to Counts One and Six

In a last ditch attempt to secure a new trial, Johnson argues that the Court erred by admitting the live rounds and shell casings found at his apartment in evidence because they "weren't matched to any weapon recovered, or used in the commission of any" crime. (Johnson Br. 22). But the definition of "relevant evidence" is much broader than Johnson's argument presupposes. Relevancy under the Federal Rules of Evidence is "extremely liberal." *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992). " '[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' is relevant." *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998) (quoting Fed. R. Evid. 401). And there is no question that the live rounds and shell casings were circumstantial evidence that Johnson possessed a gun in violation of 18 U.S.C. § 924(c) (Count Six). Moreover, as the Government points out, this evidence also tends to support his guilt on

the RICO conspiracy charge "where leaders routinely bought, stored, and supplied guns using pot money." (Gov. Resp. 23). Nor is the Court persuaded that this evidence triggers Rule 404(b).  "Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity." *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995).

For those reasons, the Court DENIES Johnson's Rule 33 motion seeking a new trial.

### c.    The Statutory Enhancement Instruction Complied with *Apprendi* and its Progeny

Finally, Jefferson argues that he is entitled to a new trial on the basis that the Court "erroneously instructed the jury regarding the allegations in the notice of enhanced sentencing." (Jefferson Reply at 5).   Under the Notice of Acts with Enhanced Sentencing provision related to Count One, the Government alleged that Defendants "conspired to commit acts involving robbery and, in the process possessed a dangerous weapon . . . ." (Indictment at 27).   As discussed, the statutory enhancement increased Defendants maximum sentence from 20 years to life in prison.  According to Jefferson, "[t]o establish this aspect of the Notice, the Government was required to prove, beyond a reasonable doubt, that [he] specifically intended to commit or help commit an armed robbery." (Jefferson Br. 23).  Such a finding was necessary, Jefferson argues, to comply with the requirements of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and its progeny. The Court disagrees.

In *Apprendi*, the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.  While 18 U.S.C. § 1963(a) increases a defendant's

statutory maximum for engaging in a particular racketeering act, it does not, as Jefferson contends, fundamentally change the RICO conspiracy statute.   On the contrary, the statutory enhancement under § 1963(a) specifically refers back to "section 1962" and applies only where the underlying RICO violation "is *based on a racketeering activity* for which the maximum penalty includes life imprisonment." *Id.* (emphasis added).   There is no dispute that "racketeering activity" includes armed robbery, 18 U.S.C. § 1961(1), which carries a  maximum penalty of life imprisonment under Michigan law.   Mich. Comp. Laws § 750.529.   In other words, the Notice of Enhanced Sentencing merely required the Government to prove that the defendant *conspired to commit a qualifying* racketeering act-i.e. murder or robbery.   In this way, it added an additional element to the Government's burden of proof.   And because it is an element, it "must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

Here, the Court complied with *Apprendi* by explicitly instructing the jury that if they found Jefferson guilty of RICO conspiracy, they "must specify whether he agreed and intended that at least one other conspirator would commit a racketeering act of robbery. In making this finding, please use the definition of robbery that I gave you previously." (Trial Tr. Vol. 18 at 38-39).   The verdict form likewise reflected the Government's additional burden in this regard. (Verdict Form, Dkt. No. 367)

This conclusion is further supported by the Seventh Circuit's decision in *United States v. Benabe*, 654 F.3d 753 (7th Cir. 2011).   There, the defendant argued that the district court erred by giving a *Pinkerton* instruction in the penalty phase of RICO trial. *Id.* at 777.   On review, the court aptly reasoned as follows:

23

> once the jury found the defendants guilty of the RICO conspiracy, the maximum penalties they each faced depended on whether the involvement of each in the conspiracy included responsibility for murders or drug crimes serious enough to authorize a life sentence. Each defendant could be held responsible for the various predicate acts charged, *either as a direct participant, as an aider-and-abetter, or under Pinkerton*. In the penalty phase, the *Pinkerton* instruction was appropriate.

*Id.* at 777-78 (emphasis added). Similarly here, once the jury found Jefferson guilty of RICO conspiracy, all that remained was a determination of whether he engaged in a qualifying enhancement- in this case, robbery or murder. Upon answering that question in the affirmative, the jury triggered the statutory enhancement provision. If the general *Pinkerton* instruction satisfied *Apprendi* in this regard, the Court is convinced that its instruction did too.[7]

Accordingly, Jefferson's Rule 33 motion for a new trial is DENIED.

## IV.   Conclusion

For the above-stated reasons, Defendants' Rule 29 and Rule 33 motions are hereby DENIED.

SO ORDERED.

---

[7] Jefferson further asserts that the Court's instruction was "inconsistent with the Sixth Circuit's opinion in *United States v. Nagi*, 541 Fed. App'x 556, 576 (6th Cir. 2013), *vacated on other grounds*, 134 S.Ct. 2288 (2014) (Jefferson Reply at 5-6). But *Nagi* is distinguishable for a number of reasons; chief among them, defendant Lenoard Moore was sentenced to life in prison without a specific finding by the jury that he participated in a qualified racketeering act. Here, by contrast, the verdict form required the jury to find that Jefferson agreed and intended "that at least one other conspirator would commit a racketeering act of robbery[.]" (Verdict Form, Dkt. No. 367). This distinction is critical.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 28, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 28, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager